## STATE OF CONNECTICUT *v.* JOSEPH DOEHRER
### (12623)

PETERS, C. J., SHEA, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued April 30—decision released July 29, 1986

*Robert L. Genuario,* for the appellant (defendant).

*Susann E. Gill,* deputy assistant state's attorney, with whom, on the brief, were *John J. Kelly,* chief

state's attorney, and *Mary Glassman,* law student intern, for the appellee (state).

DANNEHY, J. The defendant, Joseph Doehrer, was indicted for murder in violation of General Statutes § 53a-54a (a), and charged by information with assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and assault in the second degree with a firearm in violation of General Statutes § 53a-60a (a). The defendant was tried by jury and found guilty as charged of each offense. He was sentenced to imprisonment on each conviction for consecutive terms of sixty years for murder, twenty years for assault in the first degree, and five years for assault in the second degree with a firearm. The defendant claims on appeal that the trial court erred: (1) in denying his motion to suppress oral statements; (2) in admitting an allegedly prejudicial photograph; and (3) in denying his motion for mistrial. We find no error.

There was no dispute at trial that Barry Antoni was killed by the defendant on February 24, 1983. The event which precipitated the death of Barry Antoni was an incident that occurred between Patricia Antoni, the decedent's sister, and the defendant at the apartment of a mutual acquaintance, Patrick Lyons. The evidence adduced at trial established that Patricia had gone to Lyons' apartment about one and one-half weeks prior to the shooting to purchase cocaine. While at the apartment, she attempted to steal two grams of cocaine from Lyons and to leave the apartment without paying him for the cocaine she had consumed while there. At that point Lyons threatened her and telephoned the defendant and another man, Eugene Jarvis. When they arrived, the defendant pointed a gun at Patricia and the men inquired as to the whereabouts of the missing cocaine. Although Patricia was then too frightened to admit the attempted theft, the cocaine was eventually found

where she had hidden it earlier. The defendant warned Patricia that if she reported the incident to the police, they would kill her and her family.

Patricia testified that the defendant telephoned her several days after the apartment incident to ask whether she had paid Lyons for the cocaine she had used. The defendant suggested a meeting, which subsequently took place, to discuss the use of Patricia's Econoline van to transport stolen goods to New York. The next time Patricia saw the defendant was the night before her brother's death. On that evening, she accompanied the defendant and Jarvis to the apartment of the defendant's brother, where a small group had gathered for music and also to use alcohol and drugs. After the defendant had taken Patricia home, a one hundred dollar bill was believed missing from the apartment. There was some evidence that the individuals at the party wrongly suspected Patricia of the theft. Although the bill was later found, the defendant was not aware of this fact when he went to the Antoni residence the following evening.

On February 24, 1983, at about 6 p.m., Patricia, while home at the Antoni residence in Orange, Connecticut, received a telephone call from the defendant. In response to his statement that he might stop over, Patricia told the defendant not to come because her parents had visitors, but to call back in an hour. About an hour later, Barbara Antoni, the decedent's mother, heard a knock at the front door. As she was opening the door, the defendant and his companion Jarvis pushed their way into the house. The defendant grabbed Barbara Antoni and held a gun to her head. When she screamed, her husband, Cleto Antoni, and her son Barry emerged from rooms in the upper level of the house and ran downstairs. The defendant shot Barry, mortally wounding him, and then proceeded to

shoot Cleto, hitting him in the lower abdomen. During the commotion, Jarvis struck Barbara Antoni, causing her to fall backwards to the floor. By this time, Patricia had ascended the stairs from the lower level of the house and entered the hallway. She screamed at the defendant, "Why are you doing this? Why are you here? What's going on?" The defendant replied that it was because she had stolen his money. He then pointed a gun at her and fired, hitting her in the arm. At this point, the defendant and Jarvis fled the scene. Additional facts will be discussed in the opinion.

I

We first turn to the issue of whether the trial court should have suppressed evidence of statements made by the defendant during "the course of general conversation" with police officers while in their custody but prior to being advised of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Testimony at trial indicates that following the defendant's arrest in New York City on March 12, 1983, he was transported by law enforcement officials to a New York federal building. Orange police officer Neil Hathaway testified, outside of the jury's presence, that during the approximately twenty minute drive to the building, the defendant and officials had a "general conversation" in which the defendant asked the officials how they had found him. The officials replied that it had been through police work. At that point, the defendant made the following incriminating remarks: "We give up. We were expecting you. It's easier this way. I'm tired of running." Although Hathaway could not recall the content of the general conversation immediately prior to the defendant's question, he testified that it was the defendant who spoke first. The officer also stated that the defend-

ant had not been advised of his *Miranda* rights before his arrival at the federal building.

The state sought to introduce the defendant's statements at trial as an admission of flight indicative of consciousness of guilt. The state further claimed that the statements were spontaneously given and thus not a result of custodial interrogation necessitating *Miranda* warnings. See *Miranda* v. *Arizona,* supra, 478. In moving to suppress the statements, defense counsel argued that whether or not there had been an interrogation, the officers had still engaged the defendant in conversation in order to elicit incriminating statements. The trial court denied the defendant's motion and Hathaway testified as to the statements in the presence of the jury.

At the outset, we note that the warnings required by *Miranda* are designed "to combat a situation in which there are 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so.' *Miranda* v. *Arizona,* supra, 467." *State* v. *Ferrara,* 176 Conn. 508, 519, 408 A.2d 265 (1979). *Miranda* itself, however, emphasized that volunteered statements were not affected by its holding and were still admissible under the fifth amendment. *Miranda* v. *Arizona,* supra, 478.

"Before one suspected of the commission of a crime is entitled to the warnings constitutionally required by *Miranda,* two conditions are required: the suspect must be in the custody of law enforcement officials . . . and the suspect must be subjected to interrogation." (Citations omitted.) *State* v. *Vitale,* 197 Conn. 396, 411, 497 A.2d 956 (1985); see *State* v. *Stankowski,* 184 Conn. 121, 136, 439 A.2d 918, cert. denied, 454 U.S. 1042, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981). It is undisputed that the defendant was in custody at the time he made

the incriminating statements. Therefore, the only issue we need consider is whether the defendant was subjected to interrogation. " 'Interrogation' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island* v. *Innis,* 446 U.S. 291, 300, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). The term encompasses not only express questioning, but also "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id., 301; see *State* v. *Graham,* 186 Conn. 437, 443, 441 A.2d 857 (1982).

The burden of showing that a general conversation amounted to custodial interrogation lies initially with the defendant. *United States* v. *Charles,* 738 F.2d 686, 695 n.11 (5th Cir. 1984); *United States* v. *De La Fuente,* 548 F.2d 528, 533 (5th Cir. 1977); *State* v. *Vitale,* supra, 409. Our review of the record indicates that the defendant did not sustain this burden. The defendant failed to present any evidence at the suppression hearing to suggest that the officers' words or actions amounted to "interrogation" within the meaning of *Rhode Island* v. *Innis,* supra. The only evidence pertaining to this issue came from Hathaway, who testified that the defendant had not been interrogated and that it had been the defendant who initiated the conversation. We think the trial court reasonably concluded from the evidence presented that the defendant's statements were given voluntarily and were not the product of any interrogation. *State* v. *Stankowski,* supra, 137–38; *State* v. *Ferrara,* supra, 519–21; *State* v. *Schroff,* 3 Conn. App. 684, 690, 492 A.2d 190 (1985).

In determining whether the defendant's constitutional rights have been infringed, we are not limited to the evidence before the trial court at the time of the ruling but may review the record in its entirety. *State*

v. *Shifflett,* 199 Conn. 718, 729, 508 A.2d 748 (1986); *State* v. *Toste,* 198 Conn. 573, 576, 504 A.2d 1036 (1986). Our review of the record reveals no evidence whatsoever that the defendant's statements were given in response to interrogation. Significantly, the defendant himself testified at trial that he was not questioned during the ride to the federal building but was "joking" with the police. Under the circumstances of this case it is abundantly clear that the defendant has not sustained his burden of demonstrating that his statements were the product of police interrogation.

The defendant also argues that it is the state's burden to prove an intentional and knowing waiver by the defendant of his right to remain silent while in the custody of the police. We rejected a similar argument in *State* v. *Ferrara,* supra, 519–20, where we noted that "incriminating statements made by a defendant are admissible in evidence whether or not the *Miranda* warning has been given when the statements were not made during the course of a 'custodial interrogation'. . . . [A]bsent a custodial interrogation, the defendant enjoyed no right which could be the subject of a 'waiver.' " (Citations omitted.) In light of our conclusion that the "general conversation" at issue here did not amount to interrogation, any question of waiver becomes irrelevant.

## II

We next turn to the defendant's claim that the trial court erred in admitting into evidence a photograph depicting Barbara Antoni's injuries two days after the shooting incident. The photograph, offered during the testimony of Patricia Antoni, is a side view of Barbara Antoni's face and head, and shows the bruises she received from Jarvis' blow. The defendant contends that because he was not charged with causing injury to Barbara Antoni, and because the evidence indicated

that the injury was not caused by his act, the photograph was not logically relevant to any material issue of the case. Alternatively, the defendant argues that the photograph tended to evoke sympathy for Barbara Antoni and hostility toward him, and that its potential for prejudice far outweighed any possible relevance of the photograph to any issue in the case. We disagree with both contentions.

In *State* v. *DeJesus,* 194 Conn. 376, 481 A.2d 1068 (1984), we discussed extensively the rules pertaining to the admissibility of photographic evidence. We held that photographic evidence is admissible where the photograph has "a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry. Note, 73 A.L.R.2d 769, 787." *State* v. *DeJesus,* supra, 381. There is no requirement in this state that a potentially inflammatory photograph be essential to the state's case in order for it to be admissible; rather, "the test for determining the admissibility of the challenged evidence is relevancy and not necessity. *State* v. *Piskorski,* 177 Conn. 677, 701, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979)." *State* v. *Haskins,* 188 Conn. 432, 453, 450 A.2d 828 (1982). Even if a photograph has the potential to prejudice the jury, it may be admitted if, in the court's discretion, its probative value outweighs its possible prejudicial effects. *State* v. *DeJesus,* supra, 382; *State* v. *Haskins,* supra, 452–53. The trial court has wide discretion in balancing a photograph's potential prejudice against its probative value. *State* v. *DeJesus,* supra.

We have examined the challenged photograph and find that it was properly admissible. The photograph tended to corroborate the prior testimony of both Barbara and Patricia Antoni regarding the events which resulted in Barbara's injury. We have previously held that photographs which are cumulative of other

evidence presented are admissible in homicide prosecutions. *State* v. *DeJesus,* supra, 385; *State* v. *Piskorski,* supra, 701.

The photograph was also independently relevant to the issue of intent. Intent was a material element of both the murder and assault charges and it was the state's burden to prove such intent beyond a reasonable doubt. See General Statutes §§ 53a-54a (a), 53a-59 (a) (1) and 53a-60a (a); *State* v. *D'Antuono,* 186 Conn. 414, 422, 441 A.2d 846 (1982). The defendant not only denied any intent to cause the death of Barry Antoni or to cause serious physical injury to Cleto or Patricia Antoni, but also attempted to reduce the murder charge to first degree manslaughter by claiming the affirmative defense of extreme emotional disturbance. In introducing the controversial photograph, the state sought to demonstrate that the defendant and Jarvis were working together with a preplanned intent to kill Patricia and possibly the entire Antoni family. In admitting the photograph, the trial court could reasonably have concluded that it was relevant in that it tended to negate the defendant's contention that the shootings were unplanned and a result of momentary panic.[1]

---

[1] In his concurring opinion, Justice Shea ventilates his failure to "comprehend" the elementary proposition that evidence tending to establish concerted action, or plan, may be relevant to show that the participants *acted,* or carried out their plan, with the requisite criminal intent to do so. That evidence of plan, or common scheme, is relevant to the issue of intent has long been recognized in our cases. *State* v. *Lizzi,* 199 Conn. 462, 468–69, 508 A.2d 16 (1986); *State* v. *Hauck,* 172 Conn. 140, 144, 374 A.2d 150 (1976); *State* v. *Harris,* 147 Conn. 589, 599–600, 164 A.2d 399 (1960); *State* v. *Barnes,* 132 Conn. 370, 372–73, 44 A.2d 708 (1945); see 2 Wigmore, Evidence (3d Ed.) § 304. We have recently noted that evidence of plan, scheme or conspiracy " 'will be relevant as showing motive, and hence the doing of the criminal act, the identity of the actor, *and his intention,* where any of these is in dispute.' McCormick, Evidence (2d Ed.) § 190, pp. 448–49." (Emphasis added.) *State* v. *Shindell,* 195 Conn. 128, 133–34, 486 A.2d 637 (1985). We have further observed that "[c]ommon plan evidence . . . may

The defendant's alternative contention is that the prejudicial effect of the photograph far outweighed any logical relationship it had with a disputed issue of the case. As we have already pointed out, a trial court has broad discretion in weighing the potential prejudicial effect of a photograph against its probative value. *State* v. *DeJesus,* supra, 382; *State* v. *Haskins,* supra, 452–53. When the court admitted the photograph of Barbara Antoni, it implicitly found that its value outweighed its potential prejudice. On appeal, we may not disturb such a finding absent a clear abuse of discretion. *State* v. *Piskorski,* supra. We find no such abuse in the present case. The photograph was not gruesome, and the jury had already heard testimony concerning the more serious injuries inflicted upon the other members of the Antoni family. Therefore, it was reasonable for the trial court to conclude that the admission of the photograph would not inflame the passions of the jurors or unduly prejudice the defendant.

negative a claim that specific conduct resulted from accident or inadvertance, or was justified by self-defense." *State* v. *Esposito,* 192 Conn. 166, 171, 471 A.2d 949 (1984); see *State* v. *Jenkins,* 158 Conn. 149, 156, 256 A.2d 223 (1969). Assuming the continuing validity of these cases, we do not believe that the trial court can be said to have erred in admitting evidence which clearly established that the defendant committed these acts with assistance of an accomplice.

We would also reiterate, once again, that evidence is not rendered irrelevant merely because it does not lead the trier of fact to a single, compelling conclusion. *State* v. *Rodgers,* 198 Conn. 53, 59, 502 A.2d 360 (1985). That Justice Shea is able to evaluate the evidence in this case and conclude that it was not relevant does not mean that other reasonable persons might not conclude otherwise. This somewhat uninspired observation is significant only in its relation to the standard of review purportedly followed by this court in deciding questions of this nature. We have said that the " 'trial court exercises a broad discretion in admitting such evidence, and its determination will not be disturbed on appeal unless a clear abuse of that discretion is shown. *State* v. *Piskorski,* 177 Conn. 677, 700–701, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); *State* v. *Smith,* [174 Conn. 118, 123, 384 A.2d 347 (1977)].' *State* v. *Bember,* [183 Conn. 394, 408, 439 A.2d 387 (1981)]." *State* v. *DeJesus,* 194 Conn. 376, 382, 481 A.2d 1277 (1984). If this statement of the "appropriate" standard

## III

The defendant's final claim of error concerns the denial of his motion for a mistrial. During cross-examination of the defendant, the attorney for the state posed the following question in the presence of the jury: "And you're also street wise enough to realize that the penalty for murder in this state is sixty years, and the penalty for manslaughter first degree . . . . " At that point, the defendant objected and the jury was excused. The defendant moved for mistrial on the grounds that the jury was not entitled to know the penalties for the various crimes or to know that murder carried a more severe penalty than manslaughter. The court denied the motion but ruled that the state would not be permitted to make mention of the penalties provided by statute for the crimes of murder or manslaughter. When the jury returned, the court instructed it to dis-

means anything at all, it means that it matters little that this court might have decided the matter differently ab initio. It would seem that under the announced standard the proper focus would be on whether the trial court could reasonably have concluded that evidence of Jarvis' active participation in this incident would be relevant to the issue of whether he and the defendant planned to go to the victim's residence, and while there, to commit these crimes. Unless we are to erect an absolute rule that under the circumstances present here such evidence is *always irrelevant*, we should hesitate to second guess the trial court, and find that its discretion was abused "as a matter of law." *State* v. *Brown*, 169 Conn. 692, 702, 364 A.2d 186 (1975); *State* v. *Barlow*, 177 Conn. 391, 394, 418 A.2d 46 (1979).

Thus, while the conclusion drawn by Justice Shea from the evidence may not be "flawed," we do not believe that it is the only, or even the most compelling, conclusion possible. In any event, for the purposes of this case, we believe that the trial court could reasonably have found significance in Jarvis' involvement with the defendant. That having been said, the only remaining question is whether the trial court erred in admitting a photograph displaying the effects of Jarvis' involvement. Our decision in *State* v. *DeJesus*, supra, is fairly dispositive on this aspect of the case, and therefore, we must reject the defendant's claim that the photograph of Barbara Antoni was improperly admitted.

regard the partial question it had previously heard.[2] In its final charge, the court again warned the jury that it was not to be concerned with the punishment to be inflicted in the event of conviction.[3]

The defendant contends on appeal that the prosecutor's aborted question improperly brought to the jury's attention the nature of the penalties for murder and manslaughter, thus distracting the jury from its function of deciding guilt or innocence, and denying him due process of law. While we agree with the defendant that the state's question was improper, under the circumstances of this case, we do not believe it was so prejudicial as to require a mistrial.

"The general rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been deprived of the opportunity for a fair trial." *State* v. *Ubaldi,* 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). The trial court has broad discretionary powers in ruling on motions for mistrial. *State* v. *Hawthorne,* 176 Conn. 367, 372, 407 A.2d 1001 (1978); *State* v.

---

[2] The judge offered the following curative instruction:

"Ladies and gentlemen, when you left here before luncheon recess, there was a partial question that was asked by [the state's attorney], which I am now directing you to ignore, because punishment is no part of your concern during the course of this trial.

"Do you understand that? So the question will be rephrased and you are to ignore any portion of that question that you may have heard."

[3] In its final charge, the court told the jury:

"Now, before addressing myself to the discussion of the particular offenses with which the accused is charged, it is proper for me to say that you are not to be concerned with the punishment to be meted out in the event of a conviction. That matter is exclusively within the province of the Court under the limitations and restrictions imposed by law. You are to find the facts of guilt or innocence uninfluenced by the probable punishment that follows conviction or by any sympathy for the accused or his family or for any other person or persons who might in any way be affected by your decision or by sympathy for the victim or his or her family."

*Hafner,* 168 Conn. 230, 245–46, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975). "Where a motion for mistrial is made in response to a prosecutor's allegedly improper question, the burden is on the defendant to establish that, in the context of the proceedings as a whole, the question was so prejudicial that it deprived him of a fair trial. . . . 'Merely asking an improper question . . . does not necessarily mandate a mistrial.' *State* v. *Dolphin,* 195 Conn. 444, 452, 488 A.2d 812 (1985)." *State* v. *Fleming,* 198 Conn. 255, 267, 502 A.2d 886 (1986).

We do not believe that the trial judge abused his discretion in denying the defendant's motion for mistrial. While the prosecutor should not have told the jury that the penalty for murder was sixty years, "the standard for analyzing the defendant's due process claims is the 'fairness of the trial and not the culpability of the prosecutor. . . .' *State* v. *Glenn,* 194 Conn. 483, 491, 481 A.2d 741 (1984); *Smith* v. *Phillips,* 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); *State* v. *Palmer,* 196 Conn. 157, 163, 491 A.2d 1075 (1985); *State* v. *Ubaldi,* [supra, 562]; *State* v. *Cosgrove,* 186 Conn. 476, 488–89, 442 A.2d 1320 (1982)." *State* v. *Magnotti,* 198 Conn. 209, 215–16, 502 A.2d 404 (1985). In this case the prosecutor never completed the question concerning the differences in penalties. Any possible prejudice stemming from the portion of the question that the jury did hear was cured by the prompt curative instruction and the further instruction given by the judge in his final charge. *State* v. *Cavros,* 196 Conn. 519, 528, 494 A.2d 550, cert. denied, 474 U.S. 904, 106 S. Ct. 233, 88 L. Ed. 2d 232 (1985); *State* v. *Gasparro,* 194 Conn. 96, 111, 480 A.2d 509 (1984), cert. denied, 474 U.S. 828, 106 S. Ct. 90, 88 L. Ed. 2d 74 (1985); *State* v. *Falcone,* 191 Conn. 12, 25, 463 A.2d 558 (1983). In view of these circumstances, we cannot conclude that the defendant was deprived of a fair trial. The denial of the defendant's motion for mistrial was therefore proper.

There is no error.

In this opinion PETERS, C. J., SANTANIELLO and CALLAHAN, Js., concurred.

SHEA, J., concurring. Although I agree with the remainder of the majority opinion, I disagree with the portion that concludes that the photograph showing the extent of the injuries sustained by Barbara Antoni from the blow received from Eugene Jarvis, the defendant's companion in the crimes, was "independently relevant to the issue of intent." In this case there were three issues of intent for the jury to determine: (1) whether the defendant intended to cause the death of Barry Antoni, the murder victim; (2) whether he intended to cause serious physical injury to Cleto Antoni, the first degree assault victim; and (3) whether he intended to cause physical injury to Patricia Antoni, the second degree assault victim. I fail to comprehend how the photographic display of the injuries to Barbara inflicted by Jarvis has any probative value in relation to the defendant's intention toward the other victims as an element of the crimes charged.

The additional suggestion of the majority opinion that the photograph "tended to negate the defendant's contention that the shootings were unplanned and a result of momentary panic" is similarly flawed. The extent of the injuries to Barbara caused by Jarvis' blow adds nothing to the likelihood that the shootings were planned by the defendant previously and thus not the product of an extreme emotional disturbance. It was Jarvis who struck Barbara, not the defendant, whose emotional state can hardly be ascertained from the consequences of a blow delivered by his accomplice.

Although the photograph had no evidentiary value in establishing the defendant's state of mind toward the three victims at the time he fired his gun at them, I agree with the majority that it tended to corroborate

some of the events attested to by the state's witnesses. Nevertheless, since the photograph had some inflammatory potential and the testimony that Barbara had swelling and discoloration around the area of her left eye was largely undisputed, the court should have sustained the defendant's objection to the photograph. The error was harmless, however, because the photograph was not so gruesome that it could have had any material effect in arousing the passions of the jurors in comparison to the evidence of the injuries received at the hands of the defendant by the three victims of the shooting and also the testimony concerning the injuries to Barbara which the photograph merely illustrated.

Accordingly, I agree with the result.